Opinion
WOODS (Fred), J.
Do Vehicle Code sections[1] 23202 and 23206, which prohibit diversion “in any” driving under the influence case, make an exception for a developmentally disabled defendant? Our answer is no.
Procedural and Factual Background
On October 22, 1986, defendant was charged with misdemeanor violations of section 23152, subdivision (a), driving under the influence of alcohol, and section 23152, subdivision (b), driving with .10 percent alcohol in his blood. As to both counts it was alleged that he had suffered a 1984 conviction of section 23152, subdivision (a).
At his arraignment, defendant’s counsel moved for diversion pursuant to Penal Code section 1001.21 which provides: “(a) This chapter shall apply whenever a case is before any court upon an accusatory pleading at any stage of the criminal proceedings, for any person who has been evaluated by a regional center for the developmentally disabled and who is determined to be developmentally disabled by such regional center, and who therefore is eligible for its services, [if] (b) This chapter applies to any offense which is charged as or reduced to a misdemeanor, except that diversion shall not be ordered when the defendant previously has been diverted under this chapter within two years prior to the present criminal proceedings.”
A Mr. John R. Lewis, present at the arraignment, indicated to the court that he was a social worker from the Lanterman Regional Center[2] and that defendant had been diagnosed developmentally disabled. Mr. Lewis further informed the court that the regional center was not residential nor even outpatient but merely “managed” cases of developmentally disabled persons.
After several continuances, defendant’s diversion motion was heard on March 9, 1987. The court denied the motion, ruling that Penal Code section 1001.21 is inapplicable when a defendant is charged with driving under the influence of alcohol.
*1562 Defendant sought to overturn this ruling by his petition to the superior court for a writ of mandate. Superior Court Judge Jack M. Newman denied the petition. Defendant then filed a petition for a writ of mandate with the Court of Appeal. Division Four of this court denied the writ.
On November 13, 1987, defendant waived jury. By agreement, his court trial consisted of the submission into evidence of his arrest report and a stipulation concerning his blood-alcohol reading, .24 percent. The court found the defendant guilty as charged and found the alleged prior driving-under-the-influence-of-alcohol conviction true. As part of a plea-sentence agreement the court placed defendant on three years’ summary, not formal, probation subject to various conditions including attending twenty-four Alcoholics Anonymous meetings through the Lanterman Regional Center and the payment of any civil judgment arising from this case.[3] Count 2, section 23152, subdivision (b), was dismissed.
On April 25, 1989, the appellate department of the superior court filed and certified for publication their unanimous opinion affirming the judgment of conviction.
On May 31, 1989, pursuant to rule 62(a), California Rules of Court, we ordered the matter transferred to this court to secure uniformity of decision and to settle important questions of law.
Discussion

Plain meaning of section 23202

Central to our discussion is section 23202 and its prohibition against diversion. By forbidding any stay in proceedings, the essential mechanism for any diversion program, it precludes diversion in any driving under the influence case. The section provides: “(a) In any case in which a person is charged with a violation of Section 23152 or 23153, prior to acquittal or conviction, the court shall not suspend or stay the proceedings for the purpose of allowing the accused person to attend or participate, nor shall the court consider dismissal of or entertain a motion to dismiss the proceedings because the accused person attends or participates during that suspension, in any one or more education, training, or treatment programs, including, but not limited to, a driver improvement program, a treatment program for persons who are habitual users of alcohol or other alcoholism program, a program designed to offer alcohol services to problem drinkers, an alcohol or drug education program, or a treatment program for persons who are *1563 habitual users of drugs or other drug-related program, [fl] (b) This section shall not apply to any attendance or participation in any education, training, or treatment programs after conviction and sentencing, including attendance or participation in any of those programs as a condition of probation granted after conviction when permitted pursuant to this article.”
Although section 23202 applies only “prior to acquittal or conviction,” section 23206, subdivision (a)[4] imposes a similar postconviction constraint.
In ascertaining the meaning of section 23202 we begin with the cardinal rule of all statutory construction: “The fundamental rule is that a court should ascertain the intent of the Legislature so as to effectuate the law’s purpose and in determining intent the court first turns to the words used.” (People v. Overstreet (1986) 42 Cal.3d 891, 895 [231 Cal.Rptr. 213, 726 P.2d 1288], Accord People v. Woodhead (1987) 43 Cal.3d 1002, 1007 [239 Cal.Rptr. 656, 741 P.2d 154]; People v. Aston (1985) 39 Cal.3d 481, 489 [216 Cal.Rptr. 771, 703 P.2d 111].)
The words of section 23202, “in any [section 23152 or 23153] case” are all-inclusive, as are the words “if any person,” in the correlative section 23206, subdivision (a). (See fn. 4.) Their apparent meaning is that all driving-under-the-influence defendants, without exception, shall have their guilt or innocence determined without delay and without diversion and those found guilty shall be timely sentenced. This meaning is reinforced by the mandate of section 23206, subdivision (c): “The court shall not absolve a person who is convicted of a violation of Section 23152 or 23153 from the obligation of spending the minimum time in confinement, if any, or of paying the minimum fine provided in this article.”
Perceiving no ambiguity in sections 23202 and 23206 our inquiry would normally end. But defendant contends that this seeming all-inclusive prohibition against diversion is apparent only. Actually when read with Penal Code section 1001.21, ante, it is clear, defendant argues, that the Legislature intended to allow diversion for the developmentally disabled.
We therefore continue our inquiry and “look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.” (People v. Woodhead, supra, 43 Cal.3d 1002, 1008.)

*1564
Legislative History: Assembly Bill No. 541

The prologue to Assembly Bill No. 541 (hereafter AB 541) (1981-1982 Reg. Sess.), the statute which reformed California’s driving-under-the-influence laws and added sections 23202 and 23206 to the Vehicle Code, is a long and painful one. As Justice Mosk observed, quoting a turn of the century editorialist, “ ‘[i]nebriates and moderate drinkers are the most incapable of all persons to drive motor wagons. The general palsy and diminished power of control of both the reason and the senses are certain to invite disaster in every attempt to guide such wagons.’ ” (Burg v. Municipal Court (1983) 35 Cal.3d 257, 261 [198 Cal.Rptr. 145, 673 P.2d 732].)
Disaster was invited and disaster came. The statistics have become familiar: “Nearly one-quarter of all traffic accidents resulting in injury involved the use of alcohol. [Citations.] Traffic deaths in the United States exceed 50,000 annually, and approximately one-half of those fatalities are alcohol-related.” (35 Cal.3d at p. 261.) California led the parade. “Indeed, in the years 1976 to 1980 there were many more injuries to California residents in alcohol-related traffic accidents than were suffered by the entire Union Army during the Civil War, and more were killed than in the bloodiest year of the Vietnam War.” (Id. at p. 262.)
Even these statistics inadequately described the “wide swath of death, pain, grief, and untold physical and emotional injury across the roads of California” (35 Cal. 3d at p. 262) caused by drunk drivers. Legislative efforts to curb the carnage proved unavailing.
In 1979 the Legislature made this finding: “The Legislature finds and declares that problems related to the inappropriate use of alcoholic beverages adversely affect the general welfare of the people of California. These problems, which constitute the most serious drug problem in California, include, but are not limited, to the following: [fi] (a) Substantial fatalities, permanent disability, and property damage which result from driving under the influence of alcoholic beverages and a drain on law enforcement, the courts, and penal system which result from crimes involving inappropriate alcohol use.” (Health & Saf. Code, § 11760.)
It was these “substantial fatalities,” cold words to mark the loved sons and daughters of grieving parents, which created Mothers Against Drunk Driving (MADD), the source and principal sponsor of AB 541. As the Legislative Intent Service (LIS) indicates, Candy Lightner, founder and president of MADD, was a constituent of Assemblywoman Jean Moorhead, the author of AB 541.
*1565 Support for AB 541 was strong. A public opinion survey conducted by Field Research Corporation in California revealed that 88 percent of respondents favored tougher laws for drunk drivers. (LIS, Veh. Code, § 23202.) Media endorsements were both passionate and unrelenting. E.g., a KPIX television editorial in San Francisco told the story of Gail Tietjen, an 18-year-old whose drunk boyfriend crashed into a tree causing her severe brain damage. Seven years after she learned how to walk, talk and feed herself again, after she had graduated college, and after she had started a good job, another drunk driver killed her. Her mother said, “[tjhey’ve killed my daughter twice.” (LIS, SDC p. 1.)
One such KPIX editorial elicited about 500 letters which the station forwarded to the speaker of the state assembly. (LIS, SDC p. 1.)
The public wanted and AB 541 provided “[cjelerity and certainty of punishment.” (Burg v. Municipal Court, supra, 35 Cal. 3d 257, 263.) As the Assembly Committee On Criminal Justice analysis indicated, AB 541 would raise minimum fines, “would require that upon conviction . . . sentence would have to be imposed,” that entering a treatment program “permits the suspension of some, but not all, of the mandatory penalties,” etc. The Ways & Means Staff Analysis found that “[t\he most significant change is the requirement for mandatory minimum jail terms for violations of various drunk driving codes, regardless of whether probation is granted.” (Original italics.) The Senate Committee On Judiciary noted that the bill “would require the court to impose specified minimum punishments in all cases without exception” and that “this bill would prohibit a stay of proceedings before acquittal or conviction. . . .”
AB 541 did not overlook a major loophole to certainty of punishment, viz., pretrial diversion. Although it is unclear when California courts first began employing pretrial diversion, the first California statute authorizing such diversion was enacted in 1972. (Pen. Code, § 1000 et seq. See Davis v. Municipal Court (1988) 46 Cal.3d 64, 73 [249 Cal.Rptr. 300, 757 P.2d 11].) This statute authorized diversion in drug cases but soon induced “numerous local police departments and district attorneys throughout California, acting with the encouragement of grants provided by the federal government,” to implement experimental diversion programs in other cases as well. (Id. at p. 74.) When an Attorney General’s opinion questioned the validity of these experimental programs (ibid.) “the Legislature in 1977 adopted as an urgency measure the predecessor of the current chapter 2.7 (Stats. 1977, ch. 574, § 3, p. 1821).” (Ibid.) (See Pen. Code, § 1001.) This measure expressly declared that the 1972 drug diversion statute did not preempt the pretrial diversion field.
*1566 With the preemption shadow thus removed, pretrial diversion programs proliferated. One such program, specifically for driving-under-the-influence defendants, was called the “Lucky Deuce.”[5] As described by the Senate Committee On Judiciary analysis of AB 541, “Under the auspices of the court, the district attorney, and defense counsel, a first-time offender can elect to enter a year-long ‘Lucky Deuce’ program at his own expense. If he successfully completes the program, the offender can have his DUI offense reduced to a reckless, a one or two point moving violation, or even dismissed entirely when he does an outstanding job. The proceedings are stayed pending the offender’s completion of the program and the final disposition is made by the court, in its sole discretion.” (LIS p. 8.)
Although the precise number of such driving-under-the-influence diversion programs—commercial and charitable, formal and informal, prosecutor initiated and court initiated, statutory and nonstatutory—is not stated in the Legislative Intent Service, the order of their magnitude is suggested by Davis v. Municipal Court, supra, 46 Cal. 3d 64. In considering a challenge to a diversion program, created by the San Francisco District Attorney pursuant to Penal Code section 1001 et seq., the court stated that if successful this challenge might invalidate that program “as well as 811 misdemeanor diversion programs throughout the state.” (Italics added.) (Davis v. Municipal Court, supra, 46 Cal.3d 64, 73.)
It was to bar such diverse and voluminous diversion programs that section 23202 was included in AB 541. Its inclusion was not overlooked. The Legislative Counsel’s Digest stated: “The bill would prohibit a stay of proceedings before acquittal or conviction or a dismissal of the proceedings because the accused participates in a driver improvement program or treatment program for habitual users of alcohol or drugs.” All legislative committees which considered and analyzed AB 541 similarly noted the prohibition provision of its section 23202. The Senate Committee On Judiciary report stated, “When the accused was charged with driving under the influence, this bill would prohibit a stay of proceedings. . . .”
Opponents of AB 541 clearly perceived that existing law permitted unrestricted pretrial diversion (LIS, letter, p. 3) and that section 23202 prohibited all driving under the influence diversion. One such opponent, the American Civil Liberties Union, in its April 3, 1981, letter to the Assembly Committee on Criminal Justice, wrote “[a] sentencing structure which deprives judges of the right to exercise their discretion, and particularly one which deprives them of the right to use diversion programs, may, in fact, *1567 remove from society one of the more effective tools available for combatting this problem. The judge in the courtroom—not 120 legislators in Sacramento—is the best barometer of the circumstances surrounding any individual case. They should not be stripped of their judicial discretion in these matters.” (Italics added.)
Neutral observers, such as the Health and Welfare Agency, shared the common understanding of section 23202. Its analysis noted that “[cjourts [would be] prohibited from staying or suspending proceedings prior to conviction or sentencing, to allow accused persons to participate in driver improvement, alcohol or other treatment programs.” (LIS, PE p. 29.) The Department of Alcohol and Drug Programs analysis stated, “[t]he bill would prohibit any stay of proceedings with regard to these offenses. . . .” (LIS, PE p. 60.) (Italics added.)
Thus legislative intent, as revealed by the history of AB 541, accords with the plain meaning of section 23202: all driving under the influence defendants, without exception, shall have their guilt or innocence determined without delay or diversion.[6]

Conflict with Penal Code section 1001.21

Notwithstanding the plain meaning and legislative history of section 23202, defendant asserts that because he is developmentally disabled he is not barred from pretrial diversion. His argument parses the treatment programs description of section 23202, finds it more constrictive than programs afforded by Penal Code section 1001.20, and therefore concludes the two sections only “appear ... to conflict” but are “not at all irreconcilable.” We disagree.
It is clear that the phrase “education, training, or treatment programs” (§ 23202) is intended to be and is all-inclusive. It comprehends all Penal Code section 1001.20 programs. The two sections irreconcilably conflict.[7]

Specific statute controls over general statute

When a general statute conflicts with a specific statute the specific statute controls the general one. (People v. Gilbert (1969) 1 Cal.3d 475, 479 *1568 [82 Cal.Rptr. 724, 462 P.2d 580]; In re Williamson (1954) 43 Cal.2d 651, 654 [276 P.2d 593].) The referent of “general” and “specific” is subject matter, Thus, in the instant case, the subject matter of Penal Code section 1001.21 is misdemeanor diversion. That section, applying as it does to all misdemeanors, even felonies reduced to misdemeanors, comprehends hundreds of misdemeanors in scores of codes and is therefore a general statute.
By contrast, the subject matter of section 23202 is driving-under-the-influence diversion. It applies to a single type of conduct and comprehends only two offenses, sections 23152 and 23153. Section 23202 is a specific statute and controls, to the extent of their inconsistency, the general statute, Penal Code section 1001.21.[8]

More recent statute supersedes older statute

Penal Code section 1001.21, the subject diversion statute for the developmentally disabled, was enacted in 1980 (Stats. 1980, ch. 1253, § 1, p. 4232) a year earlier than section 23202 (Stats. 1981, ch. 940, § 32, p. 3571). Since the two statutes conflict, the later statute, section 23202, “by implication will be deemed to have repealed any contrary provisions contained in the earlier.” (Santa Barbara Federation of Teachers v. Santa Barbara High Sch. Dist. (1977) 76 Cal.App.3d 223, 236 [142 Cal.Rptr. 749]; accord Fuentes v. Workers’ Comp. Appeals Bd. (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449]; City of Petaluma v. Pac. Tel. & Tel. Co. (1955) 44 Cal.2d 284, 288 [282 P.2d 43]; Woodard v. Southern Cal. Permanente Medical Group (1985) 171 Cal.App.3d 656, 664 [217 Cal.Rptr. 514] [“ ‘. ... if there is an irreconcilable conflict between the new provision and the prior statutes, the new provision will control as it is the later expression of the legislature.’ ”]; Fleming v. Kent (1982) 129 Cal.App.3d 887, 891 [181 Cal.Rptr. 361] [“. . . a more recent statute will govern and take precedence over an earlier provision.”]; Carlton Santee Corp. v. Padre Dam Mun. Water Dist. (1981) 120 Cal.App.3d 14, 29 [174 Cal.Rptr. 413]; Heller Properties Inc. v. Rothschild (1970) 11 Cal.App.3d 705, 710 [90 Cal.Rptr. 133] [“. . . provisions of the statute later in time must control. . . .”].)[9]

The doctrine of expressio unius est exclusio alterius

Both defendant and the dissent rely upon the doctrine of expressio unius est exclusio alterius, i.e., “ ‘the expression of certain things in a statute *1569 necessarily involves exclusion of other things not expressed. . . (Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1391, fn. 13 [241 Cal.Rptr. 67, 743 P.2d 1323].) The doctrine is illustrated by Dyna-Med. The issue was “whether the FEHA [California Fair Employment and Housing Act] grants the commission authority to award punitive damages.” (Id. at p. 1385.) Its resolution turned on the interpretation of the following empowering phrase: “and to take such action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, and restoration to membership in any respondent labor organization. ...” (Ibid.)
Noting that the doctrine was a “mere guide[ ] and will not be applied so as to defeat the underlying legislative intent otherwise determined” (43 Cal. 3d at p. 1391), the court found that the express enumeration of four actions (hiring, reinstatement, upgrading, and restoration to membership), all of one type, impliedly excluded an unexpressed action (punitive damages) of a different type.
The doctrine was applicable, of course, because the statute expressly enumerated “certain things.”
Similarly, a detainer statute which only referred to “untried indictments, informations, or complaints” impliedly excluded sentencing. (People v. Castoe (1978) 86 Cal.App.3d 484, 489 [150 Cal.Rptr. 237].)
The doctrine is inapplicable to the instant case because there is no “expression of certain things.” Unlike Dyna-Med and People v. Castoe, the statute here leaves no room for exclusion because it includes everything. In section 23202 the all-inclusive phrase “in any case” is used; in section 23206, subdivision (a) the all-inclusive phrase “[i]f any person” is used; and in section 23206, subdivision (c) the all-inclusive phrase “a person” is used.

Consistency of section 23202 with later-enacted diversion statutes

Defendant perceives an inconsistency between section 23202’s all-inclusive diversion bar and the selective bar in subsequently enacted diversion statutes. There is no inconsistency.
As we have indicated, in 1981 when the Legislature enacted section 23202 it prohibited all driving-under-the-influence diversion programs, statutory ones like Penal Code section 1001.21, and nonstatutory ones. Later, when the Legislature enacted or reenacted diversion programs, e.g., Penal Code section 1001 et seq. (Stats. 1982, ch. 42) and Penal Code section 1001.50 et seq. (Stats. 1982, ch. 1251), in order to avoid the risk of implied *1570 repeal, it specifically exempted all driving-under-the-influence charges. In doing so it expressed its intent consistently: section 23202 bars all diversion programs.

Sentencing and rehabilitation

Our conclusion that a developmentally disabled defendant charged with driving under the influence is ineligible for diversion (§ 23202) does not mean that he or she will receive less rehabilitative assistance. Trial judges have broad sentencing discretion (People v. Lent (1975) 15 Cal.3d 481, 486 [124 Cal.Rptr. 905, 541 P.2d 545]) and may prescribe, as conditions of probation, appropriate education, training, and treatment programs. (Pen. Code, § 1203.1.)[10] Counties have a duty, in connection with alcohol education programs, to provide services for those groups with particular needs. (§23161, subd. (d).)
Moreover, the obligation of the State of California to provide all necessary and appropriate services to a developmentally disabled person (Welf. & Inst. Code, §§ 4501 et seq.) is not altered or reduced by that person being charged with a driving under the influence offense. If such a person was entitled to special habilitation services before being charged, he or she is no less entitled after being charged.
Disposition
The judgment is affirmed.
Lillie, P. J., concurred.

 Unless otherwise noted all statutory references are to the Vehicle Code.

 See Welfare and Institutions Code section 4500 et seq.

 Defendant had apparently been involved in a one-vehicle accident.

 “(a) If any person is convicted of a violation of Section 23152 or 23153, the court shall not stay or suspend pronouncement of sentencing and shall pronounce sentence in conjunction with the conviction in a reasonable time, including time for receipt of any presentence investigation report ordered pursuant to Section 23205.”

 For many years when driving under the influence was prohibited by section 502, and later by section 23102, a drunk driving violation was known as a “deuce.”

 AB 541 passed the Assembly Criminal Justice Committee by a vote of 13-0, the Assembly Ways and Means Committee 21-0, the Senate Judiciary Committee 7-0, the Assembly floor 77-0, and the Senate Floor 34-0. (LIS, PE-62.) It was signed by the Governor and filed with the Secretary of State on September 29, 1981.

 As the dissent correctly observes: “When, as here, the defendant is both mentally retarded and charged with driving under the influence of alcohol, the two sections are in conflict. One of them has to give way.”

 The dissent confuses the subject matter of a statute with the size of the class affected by the statute, and thereby erroneously concludes that the specific-general issue is a stalemate.

 With logic that eludes us, the dissent avoids this controlling principle by contradictorily stating both: “. . . the two sections are in conflict. One of them has to give way” (dis. opn., post, p. 1581) and “the statutes can be reconciled.” (Dis. opn., post, p. 1583.)

 Defendant apparently sought no special habilitation or treatment. Foregoing even a probation report, he was, pursuant to his plea bargain, placed on summary probation.