[No. B167590. Second Dist., Div. Seven. May 18, 2005.]

JOHN ZABRUCKY et al., Plaintiffs and Appellants, v.
LLOYD McADAMS et al., Defendants and Respondents.

COUNSEL

Funsten & Franzen, Don Erik Franzen; and Joshua Kaplan for Plaintiffs and Appellants.

Rosario Perry for Marquez Knolls Property Owners Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Robert S. Gerstein and Christopher Rolin for Defendants and Respondents.

OPINION

WOODS, J.—Plaintiffs John Zabrucky and Jaylene Zabrucky and defendants Lloyd McAdams and Heather Baines are adjoining neighbors in the Marquez Knolls area of Pacific Palisades. Amicus curiae Marquez Knolls Property Owners Association (MKPOA) is a nonprofit homeowners association for that area. Plaintiffs sued defendants alleging defendants' proposed addition to their residence would violate paragraph 11 of the relevant covenants, conditions and restrictions (CC&R's) by obstructing plaintiffs' view of the ocean. The court interpreted paragraph[1] 11's prohibition against erecting any struc-

---

[1] Paragraph references are to the subject CC&R's.

ture which obstructs a view as only prohibiting structures of the landscape type and not dwellings. Plaintiffs challenge the court's interpretation. We reverse.

## FACTUAL AND PROCEDURAL SYNOPSIS

### I. *Factual Background*

The Marquez Knolls CC&R's include provisions, which (1) in paragraph 1, limit residences built on the property to one story (except that a two-story residence could be approved by the architectural committee if it did not detract from anyone else's view); (2) in paragraph 2, require all buildings and any alterations to be preapproved by the architectural committee and later by the MKPOA, the powers of which lapsed permanently on December 31, 1995; (3) in paragraph 3, restrict how a residence can be built on the lot by side and front yard set-backs; (4) in paragraph 11, provide that no "tree, shrub, or other landscaping [shall] be planted or any structures erected that may at present or in the future obstruct the view from any other lot"; and (5) in paragraph 16, provide construction of a residence must commence within two years of recording the deed.

When appellants purchased their home in 1993, they were primarily induced to do so by what they claimed was the incredible, unobstructed ocean view. Respondents purchased their home in 1994. In 1995, respondents started making plans for an addition to their house. The plans called for two levels, one tucked under the main level so it would have a one-story character. Appellants learned about the planned remodel in 1999. John Zabrucky met with McAdams and objected to the addition because it would be visible from his property and destroy the unobstructed view for which he had paid.

After the meeting, McAdams asked the MKPOA for advice and, as a result, he reduced the size of the project. The footprint of the addition was shown by a stick frame structure and yellow rope on the property. The frame represented the project as reduced from the original plan. The yellow rope showed a further reduction offered by respondents as a compromise, which was also reflected in the set of plans for the addition current at the time of trial.[2] The roof of the addition would be lower than the existing roof line.

---

[2] David Bethany, a licensed contractor who testified for appellants, compared respondents' plans and the wood framing on their property and found there was a variance between the plans and the framing as far as the height of the structure was concerned and that the framing did not seem to properly align with the plans. McAdams opined Bethany's conclusions were erroneous.

## II. *Procedural History*

Appellants filed their complaint for declaratory and injunctive relief on November 26, 2001, alleging that respondents' landscaping encroached on appellants' view in violation of paragraph 11 and that respondents had begun framing an addition which would further encroach upon their view, also in violation of paragraph 11. Respondents filed an answer and a cross-complaint.

In December 2002, the parties filed a joint stipulation of facts, which stated the controversy between the parties was over the application of paragraph 11 to respondents' landscaping and proposed addition.

During a court trial, the court conducted a view of the tract. The court filed a statement of decision. On the basis of the view and photographic exhibits, the court found respondents' addition would obstruct a portion of the view from appellants' lot, respondents' existing home partially blocked appellants' view, and various other homes in the tract also partially blocked other owners' views. The court concluded it would have been impractical for the original drafters of the CC&R's to have intended that no house be built which obstructed any other owner's view. The court held that neither the planned addition nor the landscaping on respondents' property constituted a violation of paragraph 11 or a nuisance.[3] The court also denied relief on the cross-complaint.

The court denied appellants' motion for reconsideration or new trial and entered judgment on the complaint for respondents and on the cross-complaint for appellants.

Appellants filed a timely notice of appeal.

## DISCUSSION

### I. *Relevant paragraphs*

Paragraph 1: "All said lots shall be known and described as residential lots, no structure shall be erected, altered, placed or permitted to remain on any building plot other than one detached single-family dwelling not to exceed one story in height and a private garage, for not more than three cars; except;

---

[3] No issue about respondents' landscaping is raised on appeal.

where, in the judgment of the Declarant [Marquez Knolls Inc.] and approved by the Architectural Committee, one two story single-family dwelling may be erected where said dwelling will not detract from the view of any other lot."

Paragraph 2: "No building shall be erected, placed or altered on any building plot in this subdivision until the building plans, specifications, and plot plan showing the location of such building have been approved in writing as to conformity and harmony of exterior design with existing structures, in the subdivision, and as to location of the building with respect to topography and finished ground elevation by an Architectural Committee . . . ."

Paragraph 11: "No fences or hedges exceeding three feet in height shall be erected or permitted to remain between the street and the front set-back line nor shall any tree, shrub or other landscaping be planted or any structures erected that may at present or in the future obstruct the view from any other lot, and the right of entry is reserved by the Declarants to trim any tree obstructing the view of any lot."

## II. *Interpretation of the CC&R's*

The court stated: "Reading the CC&R's as a whole, the court concludes that the main dwelling structure is governed by Paragraph 1 and not Paragraph 11. The wording of Paragraph 11 clearly addresses structures relating to fences, hedges and landscaping, and not the main dwelling." Appellants contend the court misinterpreted paragraph 11 and should have used the plain meaning of "structure" as a broad term.

■ "[W]e must independently interpret the provisions of the document. . . . It is a general rule that restrictive covenants are construed strictly against the person seeking to enforce them, and any doubt will be resolved in favor of the free use of land. But it is also true that the ' "intent of the parties and the object of the deed or restriction should govern, giving the instrument a just and fair interpretation." ' . . . The intention of the parties is to be determined from the document as a whole, and if possible still give effect to every part." (*White v. Dorfman* (1981) 116 Cal.App.3d 892, 897 [172 Cal.Rptr. 326], citations omitted; see also *Ezer v. Fuchsloch* (1979) 99 Cal.App.3d 849, 861 [160 Cal.Rptr. 486] [" '[P]articular words or clauses must be subordinated to general intent.' "].)

In the instant case, in determining that "any structure" was limited to landscape-type structures, the superior court found support for its interpretation in the rule of construction of *ejusdem generis* as discussed in *White v. Dorfman, supra*, 116 Cal.App.3d 892.

Appellants assert that paragraph 11 absolutely prohibits, i.e., has a zero tolerance for, anything that obstructs the view of another lot in any manner and that the court's interpretation defeats the intent or main goal of the CC&R's to protect views. In appellants' opinion, if a residence is destroyed or demolished, any replacement must be built within the footprint of the original approved plan unless any extension or change does not obstruct the view of another lot in any manner whatsoever.

Appellants assert this case is governed by *Seligman v. Tucker* (1970) 6 Cal.App.3d 691 [86 Cal.Rptr. 187]. In *Seligman*, the court was called upon to interpret a recorded restriction for a subdivision, which provided in pertinent part: " 'No . . . structure shall be . . . erected . . . upon any lot in such location or in such height as to unreasonably obstruct the view of any other lot . . . .' " (*Id.*, at p. 693.) In concluding that the term "unreasonably obstruct" was not too vague or uncertain to be enforced, the court reasoned: "It is clear from the surrounding circumstances and the timing of the filing of the declaration of restrictions that the views dealt with in the 'view-protection' clause were those which the residences had upon their completion, by reason of their orientation on the lots and their room and window locations and of the open spaces left on other lots." (*Id.*, at pp. 697, 699.)

However, other paragraphs of the instant CC&R's prohibit certain trades, activities, and uses of the lots. Thus, reading the CC&R's as a whole, it is evident that protecting views was one of their purposes, not their only or their main purpose. Accordingly, the question is how much protection was intended.[4]

In common with most coastline housing in Southern California, the prime thing the Marquez Knolls development sold its prospective homeowners was a beautiful ocean view. In fact, like most such housing, much of the value of any property within the development depends on the quality of the view. To significantly obstruct any homeowner's view of the Pacific Ocean is to depreciate the economic worth of their property—often by several hundred

---

[4] Appellants assert that although paragraph 12 limits the height of walls and fences on the side of the lot to three feet, under respondents' interpretation, paragraph 11 would allow a wall or fence anywhere else on the lot to be any height. However, paragraph 11 imposes a restriction that a wall or fence cannot obstruct the view from any other lot.

thousand dollars—as well as dramatically reduce their enjoyment of the home they bought and live in. Thus, it is not surprising the rest of the Zabruckys' neighbors, the MKPOA, filed an amicus curiae brief seeking to enforce the development's CC&R's. These provisions, and especially the paragraph 11 at issue in this case, form their only bulwark against rampant expansions of existing residences that would obstruct views and depreciate land values throughout the entire Marquez Knolls neighborhood.

It seems highly unlikely those who framed paragraph 11 intended to limit its protections to "fences, hedges and landscaping" and not to the erection of other kinds of "structures" that might significantly destroy the views and value of homes in the Marquez Knolls development. When the lots were first sold and houses designed and constructed, views were protected by an architectural committee whose approval was required for the design and placement of all structures constructed on the lots. But once the lots were built out and the architectural committee disbanded, paragraph 11 was the only remaining restriction against what otherwise could be unlimited structural additions (at least single-story ones) to some original existing residences at the expense of the views enjoyed by other homeowners.

At the same time, while we are fairly confident about the probable intent behind paragraph 11, the language employed in this provision is not crystal clear on the question whether it prohibits the type of construction respondents propose. Many years ago, in a different context, Justice Johnson of this court pointed out the Legislature had "handed us a true conundrum" when an ambiguous statute was open to two inconsistent but reasonable interpretations. (*People v. Weatherill* (1989) 215 Cal.App.3d 1569, 1589 [264 Cal.Rptr. 298].) In that instance, he found one of those interpretations "marginally more persuasive" than the other and thus dissented. (*Id.*, at p. 1580 (dis. opn. of Johnson, J.).)

In the case at bar, the drafters of paragraph 11 appear to have handed this court a contractual "true conundrum." (The fact, as explained below, that Division Five appears to have gone both ways when interpreting nearly identical view obstruction restrictions, which also happen to be similar to the restriction before this court, in two cases decided a decade apart, tends to support this characterization.) In any event, even though the trial court's construction of paragraph 11 is not illogical or unsupportable, we are persuaded a contrary reading is marginally more logical and supportable. In part, our conclusion is influenced by information evidently not before the trial court when it made its ruling.

The trial court relied heavily on Division Five's opinion in *White v. Dorfman, supra,* 116 Cal.App.3d 892, which allowed the construction of a residence on an empty lot despite the fact it would block the adjoining landowner's view of the San Fernando Valley in apparent violation of a restriction similar, but not identical, to the one before this court. In doing so, the trial court distinguished *Seligman,* an earlier Division Five opinion, which had required removal of an expansion to an existing home, in that instance the addition of a rumpus room, which obstructed the adjoining owner's "panoramic view[]" of the lower San Fernando Valley. (*Seligman v. Tucker, supra,* 6 Cal.App.3d at p. 693.) Division Five found this expansion violated that restriction.

For reasons explained below, the language in *Seligman* is closer in text and meaning to paragraph 11 than is the language in *White.* We now turn to the relevant language of the restrictions found in the three cases, starting with paragraph 11: ". . . nor shall any tree, shrub or other landscaping be planted or any structures erected that may at present or in the future obstruct the view from any other lot, . . ."

The full restriction addressed in the *Seligman* case read: "No hedge or hedgerow or wall or fence *or building* or other structure shall be planted, erected, located or maintained upon any lot in such location or in such height as to unreasonably obstruct the view from any other lot or lots on said Tract." (Italics added.)

The restriction addressed in the *White* case read: " 'No hedge or hedgerow, or wall or fence or other structure shall be planted, erected, located or maintained upon any lot in such location or in such height as to unreasonably obstruct the view from any other lot or lots on said Tract.' " (*White v. Dorfman, supra,* 116 Cal.App.3d at p. 895.)

As can be readily seen, the sole difference between the restrictions in *Seligman* and *White* is the phrase "or building" found in *Seligman* but not included in *White.* But this difference is not the one either the *White* court or the trial court in this case seized upon to distinguish *Seligman.* In fact, the trial court here did not even have the full *Seligman* restriction before it during the trial or at the time it drafted its statement of decision.[5] Instead, the judge only had the portion of that restriction Division Five elected to quote in its

---

[5] The language of the complete restriction was first placed before the trial court as an appendix to appellant's motion for reconsideration or new trial, a motion the trial court denied. Thus, at the time of its ruling distinguishing *White* from *Seligman,* the trial court only had the incomplete excerpt of the provision in *Seligman* to compare with the full text of the restriction in *White.*

*Seligman* opinion. That excerpt read: " 'No . . . structure shall be . . . erected . . . upon any lot in such location or in such height as to unreasonably obstruct the view from any other lot . . . .' " (*Seligman v. Tucker, supra,* 6 Cal.App.3d at p. 693.)

As if to further mislead the trial court here in its interpretation of the two Division Five opinions and their application to paragraph 11, the *White* court itself distinguished its *Seligman* holding on grounds the *Seligman* restriction, in contrast to the *White* restriction, did not contain the "hedges, hedgerows, walls or fences" clause immediately preceding the "other structures" clause. As Division Five emphasized, erroneously it would appear, "Paragraph IV [the restrictive section in *White*] of the case at bar is not in the identical language as the *Seligman* restriction, as appellant suggests . . . [B]ecause of the specific *enumeration* of hedges, hedgerows, walls or fences, the phrase 'other structure' took on a particular meaning as referring to 'structures of a similar kind or nature.' " (*White v. Dorfman, supra,* 116 Cal.App.3d at p. 898.)

As a result of Division Five's omission of the full restriction from the *Seligman* opinion, compounded by the *White* court's misleading implication the language of the two restrictions was quite different, the trial court below concluded the critical distinction between the two restrictions was the "hedges, hedgerows, walls or fences" clause. After all, the *Seligman* restriction presumably lacked such a list and the court found it barred the defendant's construction even though it was only an addition to an existing residence. Meanwhile, the *White* restriction contained such a list and the court found this list meant the restriction only limited construction of structures similar to "hedges, hedgerows, walls or fences" and allowed the defendants to build an entire new residence on an empty lot. Thus, the trial court here inferred, with some logic, that the presence of a "hedges, etc." list in a restriction meant it only applied to "hedges, etc." type "structures" and permitted construction of other structures such as additions to residences even if those structures substantially obstructed the views of adjoining land owners.

As a result of its understandable misperception that the *Seligman* restriction omitted the "hedges, etc." list found in the *White* restriction, the trial court failed to focus on the salient factual difference between the two cases. To have enforced the view obstruction restriction in *White* would have prevented the defendant owner from building a residence at all on his empty lot. But enforcing that same restriction in *Seligman,* as would be the case here, only precluded adding more square footage to an existing residence. Division Five evidently was willing to protect an adjoining homeowner's view by denying a landowner the opportunity to expand his existing residence but not to deny a

landowner the right to develop his vacant residential lot at all by prohibiting construction of the one and only residence on that lot.

But even assuming the language of the *White* restriction could be construed to permit the expansion of an existing residence, as a matter of logic and precedent it does not control the interpretation of the restriction in the case before this court. To begin with, of course, unlike the trial court we are not bound by the *White* opinion and can certainly distinguish it, as suggested above, as applying only to the situation of whether an owner of a vacant residential lot is to be allowed the chance to build a residence on that lot. But more importantly, the language of the restriction before this court differs from the language of the *White* restriction and in a way that seems to substantially affect the scope of the term "structure" found in both provisions.

The trial court here used the interpretative aid of *ejusdem generis* to arrive at the conclusion the term "structures" in paragraph 11 only meant landscape-related structures and not additions to existing residences. This approach was the same one Division Five had used in construing the *White* restriction to apply only to landscape-related structures (but curiously not to be so limited in *Seligman*). But assuming *ejusdem generis* properly leads to this narrow definition of "structures" in *White* does not mean it logically produces the same result when interpreting paragraph 11 and its critically different language.

As will be recalled, the *White* restriction reads, "[n]o hedge or hedgerow, or wall or fence *or other structure* shall be planted, erected, located or maintained . . . ." (Italics added.) The *White* court held the scope of the term "other structure" was to be "construed as applicable only to . . . things of the same general nature . . . as those enumerated" earlier in the provision. (*White v. Dorfman, supra,* 116 Cal.App.3d at pp. 895, 897.) The word "other" before the word "structure" implies "similar to those just listed."

But, as will also be recalled, the restriction in paragraph 11 is worded quite differently as to the structures it prohibits and also the separation of landscape-related obstructions from structural obstructions. The paragraph 11 restriction reads, "nor shall any tree, shrub or other landscaping be planted *or any structures erected.*" (Italics added.) In this case, *ejusdem generis* applies only to the general term "landscaping" which is preceded by the specific terms "tree" and "shrub." And both the specific words and the general word are followed by a verb, "planted," that can apply only to them and not to a structure. The term "structures" appears in an entirely separate clause with its own verb, "erected." But even more significantly this general term is not

preceded by the qualifier "other," which might imply "structures similar to (or related to) landscaping," but rather by the broadest possible qualifier "any." So the plain language of the paragraph 11 restriction prohibits the erection of "*any* structures" which obstruct views on an adjoining property.

If we embraced the trial court's interpretation of the term "any structure" as limited to "landscape-related" structures (whatever that may be since even fences would have a hard time fitting into the category "other landscaping" since they fall outside the specific terms "tree" and "shrub" used to define that general term). Then by its terms, paragraph 11 would permit not only the set-back line to set-back line expansion of an existing one-story residence but also the erection of any number of possible outbuildings—a pool house, a guest house, and the like so long as they were connected, however tenuously, to the residence or the garage. (It should be noted this interpretation would also have allowed the rumpus room addition Division Five barred in the *Seligman* case.)

■ Thus, it would be more "just and fair" to adopt the interpretation of paragraph 11 understood as the proper rule by the vast majority of homeowners in Marquez Knolls. It is the interpretation calculated to protect the views and property values of these residents. And it is the one that seems most consistent with the meaning the English language ascribes to the words used in this paragraph. After all, the word "any" is defined to mean "of whatever kind" or "without restriction." (Merriam-Webster's Collegiate Dict. (10th ed. 1993) p. 53, col. 1.) And "structure" means "[a]ny construction, production, or piece of work artificially built up or composed of parts purposefully joined together (a building is a structure)." (Black's Law Dict. (8th ed. 2004) p. 1464, col. 1.) To say that the addition of several rooms to an existing residence does not fit under the term "any structure" is to say a building is not a structure and "any" means "of a special type" rather than "of whatever kind."

There is no doubt it would have been preferable for the drafters of paragraph 11 to have located the prohibition against erection of "any structure" that obstructs the view of an adjoining homeowner in its own paragraph or subparagraph. Then presumably there would have been no room for a contrary interpretation of this expansive language. But at the same time those drafters are entitled to expect the courts construing the contractual language to give ordinary words their ordinary meaning—and certainly not an opposite meaning. The term "any structure" if given its ordinary meaning certainly covers the erection of an addition containing several rooms, as is proposed here.

However, it is not reasonable to interpret the CC&R's as prohibiting any obstruction of existing views as urged by appellants. We agree with the trial court's observation that it would have been impractical for the original drafters of the CC&R's to have intended that no house be built which obstructed any other owner's view. Thus, we conclude it would be in keeping with the intent of the drafters of the CC&R's to read into paragraph 11 a provision that the view may not be unreasonably obstructed, thus the sentence would read, "may at present or in the future <u>unreasonably</u> obstruct the view from any other lot." (Change underscored.) In *Seligman*, the court noted it would determine "what is reasonable or unreasonable in light of the matter and the circumstances involved." (*Seligman v. Tucker, supra,* 6 Cal.App.3d at p. 697.) Such a provision would accord with what the architectural committee actually did when it approved of the design and location of buildings as reflected by the court's view of the development which revealed that respondents' existing home partially blocked appellants' view and various other homes in the tract also partially blocked other owners' views.

III. *Two-story structure*

We need not address appellants' contention the court erred in finding respondents' addition was not a two-story structure and should have granted their motion for reconsideration or new trial because there was no substantial evidence respondents' addition was one story.

## DISPOSITION

The judgment is reversed. Appellants to recover costs on appeal.

Johnson, J., concurred.

**PERLUSS, P. J.,** Dissenting.—Lloyd McAdams and Heather Baines want to remodel their home in the Marquez Knolls section of the Pacific Palisades by constructing a one-story addition. Their neighbors on Turquesa Lane, John and Jaylene Zabrucky, object because the addition would impair their unobstructed ocean view. Acknowledging that the neighbors' competing arguments regarding the correct interpretation of the governing covenants, conditions and restrictions (CC&R's) are closely balanced, the majority has fashioned a practical and fair resolution of the problem: McAdams and Baines may proceed with their remodeling project only to the extent it does not unreasonably obstruct the Zabruckys' view.

As sensible as the majority's compromise may be (putting aside the inevitable future disputes between these warring neighbors as to what could possibly constitute a "reasonable obstruction" of the Zabruckys' self-described "incredible, unobstructed ocean view"), the plain language of paragraph 11 of the CC&R's, upon which the Zabruckys and the majority rely, particularly when considered together with other provisions in the CC&R's, does not support the majority's evenhanded result. First, paragraph 11 cannot properly be read to restrict renovations or alterations to a property owner's existing home—a subject expressly covered by paragraph 2 of the CC&R's. Second, unlike the view protection clause in *Seligman v. Tucker* (1970) 6 Cal.App.3d 691, at page 693 [86 Cal.Rptr. 187] (*Seligman*), which prohibited new structures that " 'unreasonably obstruct the view from any other lot,' " paragraph 11's protection of a neighbor's view is by its terms absolute: If it applies, no new construction or renovation of an existing dwelling house is permissible if it obstructs a neighbor's view to any extent, excepting only those impairments that could truly be termed de minimis. (See Civ. Code, § 3533.) The majority's attempt to ameliorate the harshness of its reading of paragraph 11 by the introduction of a reasonableness test is simply not justified by the language of the CC&R's.

1. *Paragraph 11 Does Not Restrict Renovating or Altering Existing Residences*

Paragraph 1 of the Marquez Knolls CC&R's limits residences built on lots within the subdivision to one-story, single-family dwellings, except that a two-story residence could be approved by the architectural committee if it did not detract from the view of any other lot. Paragraph 2 of the CC&R's required plan approval for initial construction, as well as for the "making of any alterations" in existing residences, but only through December 31, 1995—a termination date more than 32 years after the 1963 recording date of the CC&R's. Paragraph 2 specifies in part, "No building shall be erected, placed or altered on any building plot in this subdivision until the building plans, specifications, and plot plan . . . have been approved in writing . . ." by the architectural committee or, when that committee ceased to function as of December 31, 1980, by the Marquez Knolls Property Owner's Association. This covenant further provides that all building plans will be reviewed by the committee or homeowners association for both "location" and "elevation." Paragraph 3 further limits how a residence can be constructed or remodeled by creating side- and front-yard set-back restrictions. Paragraph 11, intended at least in part as a view protection clause, provides, "No fences or hedges exceeding three feet in height shall be erected or permitted to remain between the street and the front set-back line nor shall any tree, shrub or other

landscaping be planted or any structures erected that may at present or in the future obstruct the view from any other lot . . . ."[1]

Paragraph 2, which regulates both initial construction and renovations and which uses the nouns "building" and "alterations" and the verbs "place," "alter" and "erect," would, without question, apply to McAdams and Baines's proposed addition if that provision were still in effect.[2] For whatever reason, however, the CC&R's provide that the architectural committee and home-owners association's responsibility for reviewing and approving plans for remodeling and alterations of existing homes terminates on December 31, 1995—a fact of which the Zabruckys are deemed to have had at least constructive notice when they purchased their home with its unobstructed view in 1993. (See, e.g., *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 366 [47 Cal.Rptr.2d 898, 906 P.2d 1314]; *City of Oceanside v. McKenna* (1989) 215 Cal.App.3d 1420, 1429 [264 Cal.Rptr. 275].)

In contrast to the explicit provisions in paragraph 2 regarding alterations to an existing dwelling house, the critical language in paragraph 11 is limited to the noun "structures" and the verb "erect" (that is, in addition to the verb "planted" and nouns conceded by all parties to be limited to landscaping). I believe the trial court correctly concluded the interpretation of those words— and the breadth of paragraph 11's restriction on "structures"—is necessarily influenced by their placement in the overall document, by the existence of a provision in the CC&R's expressly governing alterations to an existing residence and by the other terms used in paragraph 11, all of which concern potential obstructions of a neighbor's view separate from the residence itself: fences, hedges, trees, shrubs and other landscaping.

First, the plain meaning of the actual language used in the CC&R's supports the trial court's interpretation of paragraph 11. New structures, whether houses, fences or pergolas, are "erected"; but remodeling an existing residence normally involves "altering" the building, not erecting it. The CC&R's recognize that distinction by including "erect" and "alter" (and also

---

[1] Paragraph 12 of the CC&R's prohibits fences or walls with a height in excess of three feet on the side lines of any lot except with the approval of the architectural committee. Amicus curiae Marquez Knolls Property Owners Association suggests the restrictions in paragraphs 11 and 12 on fences and hedges in the front- and side-set back areas serve not only to protect views but also to prevent homeowners from isolating their properties from the neighborhood.

[2] Paragraph 16 of the CC&R's requires construction of all residences to begin within two years of purchase of the residential lot. Accordingly, the plans for initial construction of all residences in Marquez Knolls necessarily would have been reviewed and approved by the architectural committee well before its December 31, 1980 sunset date. The provision for an additional 15 years of oversight by the homeowners association, therefore, could only be intended to control remodeling and renovation of existing residences.

"place") in both paragraphs 1 and 2, which are unquestionably intended to govern construction and remodeling of the residences built in the subdivision. If paragraph 11 were also intended to apply to remodeling projects, there is simply no reason the same verbs would not have been repeated to accomplish that purpose. (See *Ezer v. Fuchsloch* (1979) 99 Cal.App.3d 849, 861–862 [160 Cal.Rptr. 486] [disapproving "disjointed, single-paragraph, strict construction approach to a restrictive-covenant-document interpretation" and holding CC&R's must be construed as a whole to give effect to every paragraph and to the general intent of the covenanting parties]; see also Civ. Code, § 1644 ["words of a contract are to be understood in their ordinary and popular sense"].)

Second, to the extent an interpretative aid is necessary, the applicable principle of construction in this context is *noscitur a sociis* (it is known by its associates), not *ejusdem generis*: "Under the rule of *noscitur a sociis*, ' "the meaning of a word may be enlarged or restrained by reference to the object of the whole clause in which it is used." ' [Citation.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1391, fn. 14 [241 Cal.Rptr. 67, 743 P.2d 1323].) In accordance with this principle, a court properly adopts a restrictive meaning of a listed item if acceptance of a more expansive meaning would "make the item markedly dissimilar to the other items in the list." (*Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1012 [9 Cal.Rptr.2d 358, 831 P.2d 798]; see *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 307 [58 Cal.Rptr.2d 855, 926 P.2d 1042].) Although in other contexts the word "structure" may include the residence itself, given the apparent object of paragraph 11, particularly when read together with paragraph 2, "structures" in this paragraph is properly limited to landscaping or other outdoor items separated from the residence itself—gazebos, trellises, carriage or pool houses. (See *Ezer v. Fuchsloch, supra*, 99 Cal.App.3d at p. 862 ["[t]he language, 'nor shall any tree, shrub or other landscaping be planted or any structures erected that may at present or in the future obstruct the view from any other lot,' seems clearly designed to maintain the area above the one-story homes free and clear in order to preserve the view of the individual lot owners at various elevations"].)[3]

Finally, the majority's discussion of *Seligman, supra,* 6 Cal.App.3d 691, and its critique of *White v. Dorfman* (1981) 116 Cal.App.3d 892 [172 Cal.Rptr. 326] (*White*), misapprehend the significance of those cases to the

---

[3] *Ezer v. Fuchsloch, supra,* 99 Cal.App.3d 849, interpreted the same provision of the Marquez Knolls CC&R's now before us, but with reference to a tree that had grown substantially higher than the height of a one-story dwelling. Because "trees" are expressly included within the scope of paragraph 11, the actual holding in *Ezer* does not assist our analysis.

question before us. There was no dispute in *Seligman* that the proposed construction of the rumpus room came within the scope of the view protection clause or that the construction would substantially obstruct the plaintiff's view. (*Seligman,* at p. 695.) Rather, the question before the court was only whether the clause was too vague or uncertain to permit enforcement by injunction because, unlike paragraph 11 in the case at bar, it prohibited only unreasonable obstruction of the view from another lot. (*Id.* at pp. 695–696.) The *Seligman* court had no occasion to interpret the scope of the view protection clause—and specifically whether the term "structure" included the proposed room addition—and there was simply no reason for the court to quote the language omitted by its ellipses, language that was irrelevant to the issue of vagueness actually before it.

With respect to *White, supra,* 116 Cal.App.3d 892, my colleagues are correct that differences in the operative language in the view protection clause considered in that case and paragraph 11 of the Marquez Knolls CC&R's ("hedge or hedgerow, or wall or fence or other structure" in *White* compared to "tree, shrub or other landscaping . . . or any structures" in the case at bar) make the *ejusdem generis* principle less helpful for our task than it was in *White*. But in dismissing that decision, they fail to appreciate the primary reason the restrictive covenant, limiting the height of an "other structure" obstructing the view of neighboring Trousdale Estates lot owners, was held inapplicable to the construction of a dwelling house in *White* was that the Court of Appeal found the height of a residence, rather than ancillary structures, was regulated by another provision of the CC&R's: "We believe a fair interpretation of the [CC&R's] and the plain meaning of its language indicate that paragraph III(b) imposes a specific height limit of 22 feet for buildings, structures or improvements, unless the architectural committee gave their prior written consent to build higher. Whether paragraph III(b) is for the purpose of protecting views or not need not be decided here. Paragraph IV by its own terms is a view provision and applies to things other than dwelling houses and garages." (*White, supra,* 116 Cal.App.3d at p. 897.)[4]

The CC&R's in this case parallel exactly those at issue in *White*. Paragraph 1 imposes a specific one-story height limit on dwelling houses unless the architectural committee gave its prior consent to a two-story single-family residence; paragraph 2 requires architectural committee approval for building plans for initial construction as well as renovations or "alterations" to homes

---

[4] The *White* court first construed the view protection clause to exclude dwelling houses based on its interpretation of the entire document containing the restrictive covenants and the plain meaning of the words used and then added, "This interpretation of paragraph IV is strengthened by the rule of construction *ejusdem generis* . . . ." (*White, supra,* 116 Cal.App.3d at p. 897.)

previously approved. Paragraph 2 further provides that all building plans will be reviewed for "location" and "elevation." Paragraph 11 by its own terms is a view provision. As did the court in *White*, I would construe that latter provision, based on the content of the entire document, paragraph 11's placement in the document and the plain language used, to apply to structures other than dwelling houses.[5]

### 2. *Paragraph 11's Absolute Prohibition of Structures That May Obstruct the View from Any Other Lot Cannot Be Read to Preclude Only "Unreasonable Obstructions" of View*

Apparently uncomfortable with the harsh consequences of their restrictive reading of the view protection clause, my colleagues adopt the suggestion advanced by amicus curiae Marquez Knolls Property Owners Association (but notably not endorsed by the Zabruckys) and create a reasonableness limitation on the absolute prohibition of view obstruction contained in paragraph 11. This effort to mitigate the impact of their decision for home-owners like McAdams and Baines who may wish to renovate homes that are now 40 years old is in many respects commendable, but it constitutes an impermissible rewriting of the express terms of the CC&R's. (See *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 [6 Cal.Rptr.2d 467, 826 P.2d 710] ["as a general matter, implied terms should never be read to vary express terms"]; *Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 808 [48 Cal.Rptr.2d 747] ["where the contract is unambiguous, the express language is to govern, and '[n]o obligation can be implied . . . which would result in the obliteration of a right expressly given under a written contract.' "].)

The majority's citation to *Seligman, supra,* 6 Cal.App.3d 691, as apparent support for its insertion of the word "unreasonably" before "obstruct" in the language of paragraph 11 is misplaced. By its terms, the view protection clause in *Seligman* expressly prohibited only structures that " 'unreasonably obstruct the view from any other lot . . .' " (*Id.* at p. 693.) Indeed, the issue on appeal was whether the restrictive covenant's use of the concept of reasonableness made it too vague or uncertain to be enforceable. No similar language appears in paragraph 11. Like the prohibitions against raising poultry, found in paragraph 10 of the CC&R's, and using any portion of a lot for a riding or livery stable, found in paragraph 9, paragraph 11's protection of the view from other lots—where it properly applies—is absolute.

---

[5] The majority does not attempt to reconcile the express provisions of paragraph 2 regarding alterations to the original residence with paragraph 11, which it interprets to apply to the same subject matter.

The majority's legitimate concern that paragraph 11 may be applied unreasonably suggests to me it has misinterpreted that provision. Its apprehension, however, is not a justification for a judicial rewriting of the parties' agreement.

I would affirm the judgment.

A petition for a rehearing was denied June 3, 2005.