Filed 5/30/25  Finley v. Gantz CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| ELIZABETH J. FINLEY et al., | D082623 |
| Plaintiffs and Appellants, |  |
| v. | (Super. Ct. No. 37-2019-00004914-CU-BC-CTL) |
| ERIK GANTZ, |  |
| Defendant and Respondent. |  |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

Dinsmore & Shohl, John H. Stephens and George A Rios III for Plaintiffs and Appellants.

Procopio, Cory, Hargreaves & Savitch, Kendra J. Hall, Rebecca L. Reed, Alex G. Brizolis and Megan E. Dawson for Defendant and Respondent.

This case is a dispute among homeowners arising from construction on one lot of improvements affecting views and privacy at a nearby lot. Elizabeth J. Finley and Cynthia A. Adams contend:  (1) that the extension of a deck on a lot owned by Erik Gantz and the placement of a "yurt-type structure" atop the deck is in breach of covenants, conditions, and restrictions (CC&Rs) governing the community in which the two lots are located; (2) that these structures, and activities associated with them, constitute a nuisance;

and (3) that the trial court erred in concluding otherwise as to each contention. We disagree with Finley and Adams. Thus we affirm.

## I.
## BACKGROUND

The parties' properties are situated above a canyon in the Pacific Beach community of San Diego and comprise part of a tract developed circa the 1960's called Pacifica Unit No. 5, with Gantz's property located two lots to the south of Finley and Adams's property. Each lot includes a single-family house and—in its backyard—a pool, patio, and deck with views across the canyon.

Finley and Adams purchased their lot, and Gantz purchased his lot, in 2015. Opinions regarding the quality of the southerly view from the Finley/Adams property at that time vary. According to Finley and Adams's expert, the view "included Pacific Beach, Mission Bay, Point Loma, and the distant ocean"; and, according to Finley and Adams, the view was "expansive." But in the opinion of Gantz's expert, it was "marginal."

In early 2017, a contractor hired by Gantz commenced work on a project that would result in replacement of Gantz's old deck with a new deck; extension of the deck, atop a substructure of pillars or piers, some distance into the canyon;[1] and construction of what Finley and Adams have described

---

[1] Finley and Adams assert that, as a result of the project discussed above, Gantz's deck now "extends another twenty feet into the canyon beyond his pre-existing deck, about tripling its size." Although they have invited our attention to copies of architectural diagrams in the record to support this assertion, the copy quality of those diagrams renders us unable to discern the numbers or texts set forth in them. Thus the diagrams' value as evidentiary support is limited. Be this as it may, Gantz does not appear to dispute that the new deck extends into the canyon a significant distance beyond the deck that preceded it.

2

as a yurt-type structure (to which we refer as the gazebo[2]) atop the extended deck. On August 21, 2017 (well into the construction process), the city issued a permit for the deck; and, on April 24, 2018, the city approved a change in the permit's scope to include the addition of the gazebo. Then on, July 6, 2018, after the project had been completed, the city issued its final approval.

During 2017 and 2018—at a time when the project was well underway but not yet completed—Finley, Adams, and other neighbors met with their city council representative, communicated with city code enforcement, engaged in community organizing activities (discussed *post*), and eventually reached out to Gantz in an effort to stop the project or reduce its scale.[3] But those efforts did not achieve a resolution. Thus, in 2019, Finley and Adams initiated this lawsuit.

In the operative complaint (the verified first amended complaint), Finley and Adams asserted two claims—breach of contract and nuisance. The claims proceeded to a five-day bench trial that included site visits by the

---

[2]     The gazebo is oval, made of wood, and includes a pitched roof supported by posts along its perimeter. Comprising most of the perimeter (between the posts) is a horizontal rail, rising less than half the height from the deck to the eaves, interspersed with balusters. Comprising the remainder of the perimeter are a wall that extends approximately one third to one quarter of the way around, rising from the deck to the eaves; and, between two of the posts, a floor-to-eaves opening to permit ingress and egress. The gazebo includes removeable, weatherproof fabric, floor-to-ceiling walls, with windows, that can be zipped together to completely enclose the structure, thereby giving it a yurt-like appearance. It is eleven feet tall at its highest point, and is nineteen feet wide and thirteen feet deep.

[3]     Finley and Adams have focused substantial attention on details of the prelitigation efforts to put a stop to the project; however, we do not dwell on those details because, for reasons discussed *post*, they are irrelevant to our resolution of this appeal.

trial judge, accompanied by each party's counsel, to both the Finley/Adams property and the Gantz property. At the conclusion of the trial, the court entered judgment against Finley and Adams, and in favor of Gantz, on both claims.

Finley and Adams timely appealed.

## II.
## DISCUSSION

As noted above, Finley and Adams contend the trial court erred in ruling that Gantz was not liable for breach of contract or nuisance.

### A.    The Breach of Contract Claim

The breach of contract claim is rooted in the CC&Rs. Hence we must identify, interpret, and apply the CC&Rs.

#### 1.    *The Applicable CC&Rs*

It may seem odd to say we must *identify* the CC&Rs; however, this case presents a somewhat unusual situation in that the parties disagree as to which of three documents constitutes the set (or sets) of CC&Rs that govern. These three documents are: a "Declaration of Restrictions" recorded in 1962 (original CC&Rs); an "Amended and Restated Declaration of Restrictions" recorded on January 16, 2018 (first amended CC&Rs); and a *second* (identically named) "Amended and Restated Declaration of Restrictions" recorded on February 28, 2018 (second amended CC&Rs).

The parties agree the original CC&Rs were in effect from a date before they purchased their lots until a date no earlier than January 16, 2018. But they disagree as to what if any effect should be given to the amended CC&Rs. Specifically, Finley and Adams contend the first amended CC&Rs took effect, and superseded the original CC&Rs, on January 16, 2018, and that the second amended CC&Rs took effect, and superseded the first amended

4

CC&Rs, on February 28, 2018.[4]  By contrast, Gantz contends neither of the amended CC&Rs ever took effect because each failed to comply with provisions in the original CC&Rs governing the process for making amendments and, as a consequence, that the original CC&Rs continued in effect.  We need not wade into the parties' dispute regarding the validity of the amended CC&Rs because, for reasons discussed *post*, we conclude that construction of the deck and gazebo was substantially completed prior to the dates that Finley and Adams say the amended CC&Rs took effect.[5]  Thus, the applicable CC&Rs for our purposes are the original CC&Rs.

     **2.**     ***Interpretation of CC&Rs and Standard of Review***

In interpreting the original CC&Rs, we commence with the observation that the " ' "same rules that apply to interpretation of contracts apply to the interpretation of CC&R's." ' " (*Bear Creek Master Assn. v. Southern California Investors, Inc.* (2018) 28 Cal.App.5th 809, 818; see also *Eisen v. Tavangarian* (2019) 36 Cal.App.5th 626, 635 (*Eisen*); *Zabrucky v. McAdams* (2005) 129 Cal.App.4th 618, 622 (*Zabrucky*).)  Among these rules are the rule that "[t]he language of a contract is to govern its

---

[4]    The parties agree the two amended CC&Rs are substantively identical to one another.  Finley and Adams attribute the filing of two sets of amended CC&Rs to "a mix-up."  They say the second amended CC&Rs were recorded because the first amended CC&Rs "had hand-written notes" on them but that "the content [of the two sets of amended CC&Rs] was the same."  In keeping with this explanation, Gantz characterizes the second amended CC&Rs as "a clean version of" the first amended CC&Rs.

[5]    It should be understood that our use of the term CC&Rs to refer to the document recorded on January 16, 2018, and the document recorded on February 28, 2018, is not to be construed as a validation of either document.  We express no view as to whether either of these two documents ever took effect because neither is material to our analysis.

5

interpretation . . . if the language is clear and explicit" (Civ. Code, § 1638) and the rule that the contract is to be construed as a whole so as to give effect to every part. (Civ. Code, § 1641.) " 'Where, as here, the trial court's interpretation of . . . CC&R's does not turn on the credibility of extrinsic evidence, we independently interpret the meaning of the written instrument.' " (*Eisen,* at p. 635; accord *Ekstrom v. Marquesa at Monarch Beach Homeowners Assn.* (2008) 168 Cal.App.4th 1111.)

In interpreting CC&Rs, we are further guided by the principles that "a landowner has no right to an unobstructed view over adjoining property;" that " ' "the law is reluctant to imply such a right;" ' " and that, "[a]though such a right may be created through adoption of enforceable CC&R's [citation], " '[i]t is a general rule that restrictive covenants are construed strictly against the person seeking to enforce them, and any doubt will be resolved in favor of the free use of land.' " (*Eisen, supra,* 36 Cal.App.5th at p. 635; see also *Zabrucky, supra,* 129 Cal.App.4th at p. 622.) This said, however, we also are guided by the principle " 'that the " 'intent of the parties and the object of the [CC&Rs] should govern, giving the instrument a just and fair interpretation.' " ' " (*Zabrucky,* at p. 622; see also *Eisen,* at p. 636 [court's " 'duty [is] to interpret the [CC&Rs] "in a way that is both reasonable and carries out the intended purpose of the contract" ' "].)

While interpretation of CC&Rs is de novo, a determination as to whether CC&Rs as interpreted have been breached is based on the substantial evidence standard.

> "This traditional standard of review is highly deferential. It has three pillars. First, we accept all evidence supporting the trial court's order. Second, we completely disregard contrary evidence. Third, we draw all reasonable inferences to affirm the trial court. . . . Under

6

this standard of review, parties challenging a trial court's factfinding bear an ' "enormous burden." ' [Citation.]

"If substantial evidence supports factual findings, those findings must not be disturbed on appeal. [Citation.] "Inferences favorable to appellants may create conflicts in the evidence, but that is of no consequence. [Citation.] When a civil appeal challenges findings of fact, the appellate court's power begins and ends with a determination of whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court findings. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. [Citation.]

"Our job is only to see if substantial evidence exists to support the verdict in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581–582.)

See also Eisenberg et al., California Practice Guide: Civil Appeals and Writs (The Rutter Group 2024) ¶ 8:52, p. 8-26 ["The testimony of a single credible witness—even if a party to the action—may constitute 'substantial evidence.' "]; *In re* Marriage *of Mix* (1975) 14 Cal.3d 604, 614 [" 'The testimony of a witness, even the party himself, may be sufficient.' "]; *Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429, fn. 5 [" 'So long as there is "substantial evidence," the appellate court *must affirm* . . . even if the reviewing justices personally would have ruled differently had they presided over the proceedings below, and even if other substantial evidence would have supported a different result. Stated another way, when there is substantial evidence in support of the trial court's decision, the reviewing court has *no power to substitute its deductions*.' "].)

We note further that a finder of fact's view of premises in dispute itself qualifies as "independent and substantial evidence" (*Vaughn v. De Kreek* (1969) 2 Cal.App.3d 671, 678 (*Vaughn*)) and that, even though such "evidence . . . from its very nature is not incorporated in the written record," we nonetheless "are required to presume that [it] supports the . . . judgment." (*Anderson v. State* (1943) 61 Cal.App.2d 140, 145 (*Anderson*) "Evidence obtained by the trier of fact viewing the premises has been held sufficient to support a judgment." (*Ibid.*)

Finally, it should be understood that in reviewing the proceedings below we do not confine our analysis to the rationale the trial court has supplied for its decision. To the contrary, "[w]e review the judgment, not the reasoning of the court below." (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 769; see also *Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 568 ["There is perhaps no rule of review more firmly established than the principle that a ruling or decision correct in law will not be disturbed on appeal merely because it was given for the wrong reason. If correct upon any theory of law applicable to the case, the judgment will be sustained regardless of the considerations that moved the lower court to its conclusion."]; *In re A.S.* (2011) 202 Cal.App.4th 237, 246 [holding in connection with application of substantial evidence standard that " ' "[w]e uphold judgments if they are correct for any reason, 'regardless of the correctness of the grounds upon which the court reached its conclusion.' [Citation.] 'It is judicial action and not judicial reasoning which is the subject of review.' " ' "]; *Ramirez v. Gilead Sciences, Inc.* (2021) 66 Cal.App.5th 218, 223 [" ' "If the decision of the lower court is right, the judgment or order will be affirmed regardless of the correctness of the grounds upon which the court reached its conclusion." ' "].)

With these principles in mind, we now turn our attention to the CC&Rs at issue in this case.

### 3.  *Analysis*

In their arguments directed at the original CC&Rs, Finley and Adams focus primarily on four specific paragraphs of those CC&Rs and on what they contend are enforceable view protections that may be *inferred* from those CC&Rs and from other circumstances.  The four referenced paragraphs, each of which Finley and Adams say Gantz breached, read as follows:

"1.  No lot shall be used except for single-family residential purposes.  No building shall be erected, altered, placed or permitted to remain on any lot other than one single-family dwelling not to exceed one story in height, above said lot's frontage street, or when the specific approval of the Architectural Control Committee has been obtained, one single-family dwelling, two stories in height, above said lot's frontage street.

"[¶ . . . ¶]

"3.  No noxious or offensive activity shall be carried on upon any lot, nor shall anything be done thereon which may be or may become an annoyance or nuisance to the neighborhood.

"[¶ . . . ¶]

"5.  No structure of a temporary character, trailer, basement, tent, shack, garage, barn or other outbuilding shall be used or stored on any lot at any time as a residence, either temporarily or permanently.

"[¶ . . . ¶]

"10.  No building shall be erected, placed, or altered (including but not limited to the addition of patio covers, fences over forty-two (42) inches in height, shelter covers, carports, pumphouses, or any other type of structure) on any lot until the construction plans and specifications and a

plan showing the location of the structure have been approved by the Architectural Control Committee as to quality of workmanship and materials, harmony of external design with existing structures, location, or as to any other consideration within the discretion of the Architectural Control Committee."

We shall now address each of these paragraphs, albeit in an order that deviates from the sequence in which they appear in the original CC&Rs. So doing, we begin with paragraph 5.

### a. Paragraph 5

Paragraph 5 lists eight things (a structure of a temporary character, a trailer, a basement, a tent, a shack, a garage, a barn, and what it refers to as any other outbuilding), and says that none of these things may ever be "used or stored" on the property "*as a residence*" (italics added). The trial court found that neither the deck nor the gazebo had been used as a residence, and the record includes substantial evidence to support this finding. Such evidence includes this testimony of Gantz:

"Q. Is this gazebo plumbed?

"A. It is not.

"Q. So there's no running water in there?

"A. No, there's not.

"Q. And no one's ever lived in there, have they?

"A. No. No. Never.

"Q. Never?

"A. No one's ever slept in it. I mean it's basically an outdoor living room that we just hang out when we're outside. That's it."

10

On the basis of this substantial evidence, we conclude the trial court did not err in concluding that construction of the deck and gazebo did not breach paragraph 5.[6]

### b.    Paragraph 10

Paragraph 10 says that "[n]o building shall be erected, placed, or altered" *absent certain approvals from the Architectural Control Committee.* The parties agree that the architectural control committee disbanded many years prior to 2015 (when they each acquired their respective properties); that it did not exist when construction activities on the Gantz property commenced in early 2017; and that it still did not exist at the start of

---

[6]    Finley and Adams contend "the intent of paragraph 5 is to prohibit structures that can be *converted* to a residence." But this interpretation clashes with the plain meaning of paragraph 5. Paragraph 5 does not say: no outbuilding that could be converted into a residence shall be used or stored on the property. Instead it says: "[n]o . . . outbuilding shall be used or stored . . . as a residence."

Finley and Adams also draw a distinction among the eight different categories of things listed in paragraph 5. To illustrate this distinction they say: "It would not be a reasonable interpretation of the paragraph to *prohibit* garages or basements though those structures could be converted to a residence. On the other hand, it would not be reasonable either to *allow* trailers, shacks or barns as long as they are not being used as a residence." But paragraph 5 makes no such distinction.

11

November 2017.[7]  However, the trial court found that "[t]he deck construction . . . was substantially completed in October 2017," that "[t]he gazebo was installed as of October 28, 2017" and, consequently, that, "[a]t the time [Gantz] commenced construction of the deck/gazebo and at the time of

---

[7]    Each party offers contradictory accounts as to when (and, in the case of Gantz, even whether) the architectural control committee was reconstituted. Thus, for example, in one passage of their briefs, Finley and Adams say "the three-member ACC, including plaintiff Finley, was selected" "on November 17, 2017."  In another passage, they say "the new ACC was elected in December 2017."  And in yet a third passage, they say "the new ACC was in place" "as of mid-January 2018."  In similar fashion, Gantz, in one passage of his briefs, concedes the committee was "newly constituted" at some point during the November 2017 through February 2018 timeframe and, in another passage, says "[t]he earliest the ACC was reconstituted was on January 16, 2018."  Yet, in other passages, he refers to the committee as having been "*purportedly* reconstituted" (italics added) and "not validly reconstituted" at all.  We express no view as to when, or if, the architectural control committee was validly reconstituted.

12

their completion,[8] there was no architectural control committee in existence."

Thus, in the trial court's words, it would have been "impossible for [Gantz] to perform (i.e., submit to and receive approval from an architectural

---

8        We presume the court's reference to "the time of [the deck and gazebo's] completion" is intended to refer to those structures' *substantial* completion during the October 2017 timeframe, as it is undisputed that some additional construction work on the structures occurred between substantial completion and final city approval.  Finley and Adams contend this additional construction work qualified as alterations to the residence on the Gantz property and thus ran afoul of the restriction in paragraph 10 requiring that "[n]o building shall be erected, placed, or *altered* . . . until the construction plans and specifications and a plan showing the location of the structure have been approved by the Architectural Control Committee" (italics added).  But this line of reasoning strikes us as problematic in several ways.  First, neither party offers a practical suggestion (or *any* suggestion) as to what manner of improvement—application of a coat of varnish?  installation of an electrical outlet?  addition of window blinds?—should qualify as an alteration.  Second, even if we were to recognize in a newly reconstituted architectural control committee some authority over the remaining finishing touches that were to be added to the deck and gazebo, it is evident that such authority would not bring Finley and Adams the relief they seek—which is liberation from what they have described as the "looming presence" of the gazebo and extended deck.  Third, the general rule (discussed *ante*) that restrictive covenants are to be construed strictly against the person seeking to enforce them, with any doubt being resolved in favor of the free use of land, weighs conclusively against a construction that would effectively tell a homeowner that, until the final shingle has been placed on the roof of his new outbuilding, he is at risk of a committee springing to life that could require demolition of the entire structure.

13

control committee that did not exist)."[9] (See *Eisen, supra,* 36 Cal.App.5th at p. 641 [holding, in situation in which architectural control committee had ceased to exist, that "the absence of an entity with the authority to review and approve building plans nullifies that requirement as a precondition to proceeding with renovations and remodeling"]; *Mineral Park Land Co. v. Howard* (1916) 172 Cal. 289, 292 ["It is . . . well settled that where performance depends upon the existence of a given thing, and such existence was assumed as the basis of the agreement, performance is excused to the extent that the thing ceases to exist or turns out to be nonexistent."]; Civ. Code § 1596 ["The object of a contract must be . . . possible . . . by the time the contract is to be performed."].)

The record includes substantial evidence to support the trial court's finding that the construction/installation of the deck/gazebo was substantially complete before the earliest of the months—November 2017 (see *ante*)—in which Finley and Adams have suggested the architectural

---

[9] In an e-mail dated November 15, 2017, Judy Nugent, a neighbor who testified in support of Finley and Adams framed the matter this way: "Per our 1962 CCR's, [Gantz] was required to submit a building permit request to the ACC prior to applying, however, since we had no committee, we are going to have difficulty pursuing this case legally. We need to get this committee in force ASAP to stand a chance to deal with this structure." In a subsequent e-mail, another neighbor, David Bricken, wrote: "[Gantz's] attorney definitely has a leg to stand on with the point she made about the ACC attempting to retro-actively enforce the 'revised' [CC&R]s that were recently passed, and which weren't in place at the time of construction of the structure on the deck."

14

control committee was reconstituted.[10]  Such evidence includes testimony of Finley that, "[i]n October 2017, most of the deck structure and surface were completed," and "the deck and the structure it sits atop was there at the property in October of 2017."  It also includes this testimony of Adams:

> "Q.  Do you recall when it was that the yurt was actually placed on the deck?
>
> "A.  I do.
>
> "Q.  When is that?
>
> "A.  It was, I believe, October 27th or 28th in '17. . . .  The kit for the framing went up in one day.  They spent many weeks finishing it after that, but it went up in one day."

---

[10]  The parties focus substantial attention on equitable issues relating to the sequence of events and passage of time.  Thus, for example, Gantz argues (and, in finding laches, the trial court agreed) that he was prejudiced as a result of Finley and Adams having delayed, until after the deck was substantially complete, before surfacing their concerns to him.  For their part, Finley and Adams argue that—notwithstanding the fact that the city issued permits for the project and approved the construction after the project had been completed—Gantz should be penalized because construction began months before the permits issued.  Citing Civil Code section 3517 ("[n]o one can take advantage of his own wrong"), they argue Gantz "would not have been anywhere near substantial completion of the deck, and the yurt would not have existed when the new ACC became effective, had he not done construction without permits."  Insofar as the affirmative defense of laches is concerned, we need not address the matter because (as discussed *post*) we conclude Finley and Adams have not established a breach of contract or nuisance.  As for application of section 3517, we note that determinations under this maxim are a matter of judicial discretion (*In re Brandie W.* (1984) 157 Cal.App.3d 110, 113), and we are not of the view that the trial court abused its discretion in according little if any weight to the construction of the deck and gazebo having been commenced prematurely.

In addition, the evidence includes a photograph (exhibit 102) dated October 28, 2017, that reveals what could be described as a substantially completed deck and gazebo and about which Finley testified as follows:

> "Q. Was this the state of the deck and gazebo as far as you understood as of this date, October 28, 2017?
>
> "A. Yes.
>
> "Q. At this time, October 28, 2017, there was no architectural control committee for Pacifica Unit Number 5, was there?
>
> "A. Not to my knowledge.
>
> "Q. In fact, the first time you're aware that an ACC has existed in the neighborhood is January 2018; isn't that right?
>
> "A. January '18 is when the reconstituted ACC occurred."

On the basis of this substantial evidence, we conclude that construction of neither the deck nor the gazebo breached paragraph 10.

### c. Paragraph 1

Paragraph 1 requires an analysis that is somewhat more complicated than our analyses of paragraphs 5 and 10. It says "[n]o *building* shall be erected, altered, placed or permitted to remain on any lot other than one single-family dwelling" (italics added). Finley and Adams argue the gazebo should be classified as a "building" within the meaning of this passage. But we conclude otherwise. Our conclusion in this regard is informed primarily by a comparison of paragraphs 1, 5, and 10.

Paragraph 5 makes clear that it is permissible for a property owner to use or store on his property any of eight categories of things other than or in addition to the single-family dwelling contemplated in paragraph 1. Pursuant to paragraph 5, these eight categories of things include: a

16

"structure of a temporary character, trailer, basement, tent, shack, garage, barn or other outbuilding," as long as it is not serving as a residence.  In other words, such items (to the extent not used as residences) are allowable, notwithstanding the requirement in paragraph 1 that the only kind of "*building*" allowable is "one single-family dwelling."  Consequently, the term "building" must be construed narrowly so as to exclude from its meaning each of those eight things.

Turning to paragraph 10, *it* makes clear that (subject to the approval of an architectural control committee) a property owner may "alter[]" a "building" by adding any of six types of structures to it.  Pursuant to paragraph 10, these six types of structures include:  "patio covers, fences over forty-two (42) inches in height, shelter covers, carports, pumphouses, or any other type of structure."  Inasmuch as each of these types of structures is an item the introduction of which paragraph 10 classifies as an *alteration* to a building, it cannot itself be a building.

A deck is not any of the eight categories of things listed in paragraph 5, nor of course is it a building.  Instead, it is an "other type of structure" within the meaning of paragraph 10.  That is, a deck is a structure with which a building may be "altered" within the meaning of that paragraph.

Unlike a deck, a gazebo (or a yurt or "yurt-like structure") is not so easily classified.  Depending on its design and composition, it could reasonably be classified as a "shack . . . or other outbuilding" (paragraph 5) or as a "patio cover[], . . . shelter cover[], . . . or any other type of structure" (paragraph 10).  And it could be classified (in addition or instead) as something *other than* any of the eight categories of things or six types of structures set forth in paragraphs 5 and 10.  Indeed, depending on its design and composition, it could even be classified as a building.

17

However, returning to paragraph 1 and reviewing the evidence in the record, we conclude that classifying the gazebo in this case as a building would clash with the meaning of that paragraph's second sentence: "No building shall be erected, altered, placed or permitted to remain on any lot other than one single-family dwelling not to exceed one story in height, above said lot's frontage street, or when the specific approval of the architectural control committee has been obtained, one single-family dwelling, two stories in height, above said lot's frontage street." Certainly, it is reasonable to construe this sentence as proscribing the presence on the property of a commercial office building. That would violate the single-family-residence use restriction. So too would it be reasonable to construe the sentence as proscribing the presence, or alteration, of a multi-family dwelling or of a dwelling exceeding two stories in height, as that would violate the use or height restriction. But proscribing the presence or alteration of an outbuilding (paragraph 5), or the alteration of a dwelling through the addition of "any other type of structure" (paragraph 10), would place paragraph 1 in direct conflict with paragraphs 5 and 10. For in such a scenario, no outbuilding or other structure on the property, apart from a single-family dwelling, (e.g., no outbuilding allowable under paragraph 5 and no structure allowable under paragraph 10) could ever be altered.

For all of these reasons, to construe the original CC&Rs as a whole so as to give effect to every part, we conclude the term "building" must be construed narrowly. Applying a narrow construction of the term building, accepting the trial court's finding (see *ante*) that neither the deck nor the gazebo had been used as a residence, and finding substantial evidence in the record that the gazebo—which as noted above is unplumbed—is ill-suited for use as a dwelling or residence, we further conclude that the gazebo does not

18

qualify as a "building" within the meaning of the CC&Rs. Instead it is either an "outbuilding"[11] or an "other structure."[12] (See *People v. Smith* (1994) 21 Cal.App.4th 942, 951 [defining "outbuilding" as "[a] small building appurtenant to a main building, and generally separated from it; e.g., outhouse; storage shed" and as "[s]omething used in connection with a main building," quoting Black's Law Dict. (5th ed. (1979) p. 993, col. 1.)].)

### d. Paragraph 3

Paragraph 3 differs from paragraphs 1, 5, and 10 in that it addresses activities rather than buildings, structures, or things. It says "[n]o noxious or offensive activity shall be carried on upon any lot, nor shall anything be done thereon which may be or may become an annoyance or nuisance to the neighborhood." Inasmuch as paragraph 3's invocation of the term nuisance implicates our analysis of Finley and Adams's separate claim for nuisance, we defer an examination of paragraph 3 to our discussion below under the heading "Nuisance."

### e. Implied View Protections

As noted above, Finley and Adams's breach of contract argument focuses not only on paragraphs 1, 3, 5, and 10 of the original CC&Rs, but also on view protections they contend should be *inferred* (i) from height, setback, landscape, fencing, and architectural control restrictions set forth in the original CC&Rs and (ii) from the manner in which the developer of Pacifica Unit No. 5 oriented the development's lots, and the houses it built on those lots, when it developed the tract circa the 1960s. In support of this

---

[11] Finley and Adams concede the gazebo is an outbuilding.

[12] Of course it is conceivable that someone might one day begin using the gazebo, either as is or in some altered form, as a residence. But, in that event, the gazebo would fall out of compliance with paragraphs 1 and 5 of the original CC&Rs.

argument, they rely principally on *Zabrucky, supra,* 129 Cal.App.4th 618.[13] But *Zabrucky* is not particularly helpful to Finley and Adams's cause.

*Zabrucky* involved a coastal development in which the owners of one coastal residential property objected to the plans of adjoining residential property owners to add an addition to their home. (*Zabrucky, supra,* 129 Cal.App.4th at p. 620.) At issue was whether the addition would violate the community's CC&Rs. (*Id.,* at p. 619.) In discussing the CC&Rs, the court of appeal made the unremarkable observation that a beautiful ocean view is valuable. (See *id.* at pp. 623–624.)

Using this observation as a springboard, Finley and Adams contend the restrictions imposed by the CC&Rs at issue in *Zabrucky* are similar to those imposed by the CC&Rs at issue in *this* case. Focusing in particular on what they refer to as "the paragraph limiting landscaping" in the *Zabrucky* CC&Rs, they point out that the court of appeal in *Zabrucky* "found it highly unlikely that the framers of the paragraph intended to limit its protections to fences, hedges and landscaping, and not structures that 'might significantly destroy views and value of homes.' *Zabrucky*, at p. 624." Then they imply that it is for this reason that that court interpreted "the paragraph limiting landscaping" in such a manner as to protect views generally, rather than just "limit[ing] its protections to fences, hedges and landscaping."

But the implied representation that "the paragraph [in the *Zabrucky* CC&Rs] limiting landscaping" referred *only* to landscaping is misleading. As revealed in a side-by-side comparison, "the paragraph limiting landscaping" in the *Zabrucky* case (paragraph 11) differs substantially from the paragraph

---

13     Finley and Adams also rely on *King v. Kugler* (1961) 197 Cal.App.2d 651; however, in that case the defendants *admitted* that the purpose of the CC&Rs provision in issue was "to preserve . . . views." (*Id.,* at p. 653.)

limiting landscaping in the present case, in that the former by its express terms imposes an expansive prohibition against the introduction of view obstructions whereas the prohibition imposed by the latter is exceedingly narrow.

| *Zabrucky v. McAdams* Paragraph 11 | *Finley v. Gantz* Paragraph 7 |
|---|---|
| "No fences or hedges exceeding three feet in height shall be erected or permitted to remain between the street and the front set-back line nor shall any tree, shrub or other landscaping be planted or *any structures* erected *that may at present or in the future obstruct the view from any other lot . . .*" (*Zabrucky, supra,* 129 Cal.App.4th at p. 622 (italics added).) | "No trees or shrubs shall be allowed to grow in such a manner as to impair view of neighboring properties." |

As can be seen, unlike paragraph 7 from the Pacifica Unit 5 CC&Rs, paragraph 11 from the *Zabrucky* CC&Rs *by its express terms* applied, expansively, to *any* structure that might *ever* obstruct a view from *any* lot.

Commenting on paragraph 11 and the CC&Rs of which it was a part, the *Zabrucky* court observed that those CC&Rs "and especially . . . paragraph 11 . . . form [*the*] *only bulwark* against rampant expansions of existing residences that would obstruct views and depreciate land values throughout the entire . . . neighborhood." (*Zabrucky, supra,* 129 Cal.App.4th at p. 624, italics added.) Simply stated, that bulwark is absent—not implicit—in the original CC&Rs in the present case.

Certainly, the CC&Rs at issue in the present case include restrictions (e.g., requirements governing height, setback, landscape, fencing, and

architectural-control matters) that protect views.  But—constrained by the rule that "restrictive covenants are construed strictly against the person seeking to enforce them" and that " 'any doubt [is to] be resolved in favor of the free use of land' " (see *ante*, discussing *Eisen, supra,* 36 Cal.App.5th at p. 635 and *Zabrucky, supra,* 129 Cal.App.4th at p. 622)—we will not infer from these *targeted* restrictions (or from the manner in which houses and lots were oriented by the developer) a more *generalized* proscription against improvements that could obstruct some views.

## B.     The Nuisance Claim

As noted above, Finley and Adams contend the extension of the deck and erection of the gazebo on the Gantz property, and activities associated with the deck and gazebo, constitute a nuisance.

### 1.     *Substantiality, Unreasonableness, and the Standard of Review*

As defined in the Civil Code, a nuisance can be "[a]nything which is . . . an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property."  (Civ. Code § 3479.)  It can be public, private, or both public and private.  (See Civ. Code §§ 3480–3481; *Birke v. Oakwood Worldwide* (2009) 169 Cal.App.4th 1540, 1551; *Mendez v. Rancho Valencia Resort Partners, LLC* (2016) 3 Cal.App.5th 248, 261–264 (*Mendez*).)

But not every interference is a nuisance.  (*People ex rel. Gallo* (1997) 14 Cal.4th 1090, 1105 (*Gallo*) [public nuisance]; *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 938 (*San Diego Gas & Electric*) [private nuisance].)  "To qualify . . . , the interference "must be both substantial and unreasonable."  (*Gallo,* at p. 1105; see also *San Diego Gas & Electric*, at p. 938.)

22

As this court has emphasized, "[t]he requirements of *substantial damage* and *unreasonableness* are not inconsequential." (*Mendez, supra,* 3 Cal.App.5th at p. 263.)

> " ' "These requirements stem from the law's recognition that:
>
> "Life in organized society and especially in populous communities involves an unavoidable clash of individual interests. Practically all human activities unless carried on in a wilderness interfere to some extent with others or involve some risk of interference, and these interferences range from mere trifling annoyances to serious harms. It is an obvious truth that each individual in a community must put up with a certain amount of annoyance, inconvenience and interference and must take a certain amount of risk in order that all may get on together. The very existence of organized society depends upon the principle of 'give and take, live and let live,' and *therefore the law of torts does not attempt to impose liability or shift the loss in every case in which one person's conduct has some detrimental effect on another.* Liability . . . is imposed in those cases in which the harm or risk to one is greater than he ought to be required to bear under the circumstances, at least without compensation." ' " (*Ibid.*, quoting in part *San Diego Gas & Electric, supra,* 13 Cal.4th at pp. 937–938 and Rest.2d Torts, § 822, com. g, p. 112, italics added.)

As to each of the two elements just discussed—substantial damage and unreasonableness—an objective standard is to be applied. (*Mendez, supra,* 3 Cal.App.5th at p. 263.) Inasmuch as there are disputed facts and inferences to be resolved in determining the presence or absence of substantial or unreasonable damage, we apply the substantial evidence standard (see *Shoen v. Zacarias* (2019) 33 Cal.App.5th 1112, 1119 [private nuisance]; *City of Claremont v. Kruse* (2009) 177 Cal.App.4th 1153, 1164 [public nuisance]) discussed *ante*.

## 2. *Analysis*

Finley and Adams base their nuisance claim on two types of disruptions that they contend have interfered with enjoyment of their property:  (1) "noise disruptions" and (2) disruptions of a visual nature.  As to the first type of disruption, they say the deck and gazebo "have been used for loud late-night parties and for flying drones."  Regarding the second type of disruption, they say the extension of the deck and introduction of the gazebo (a) have obstructed some of the sightlines *from* their property and (b) have introduced *new* sightlines, from the Gantz property *toward* their property, that were not present before.

Insofar as the first type of disruption is concerned, the trial court heard testimony pertaining to parties and drone flights.  But that testimony included substantial evidence supporting a conclusion that any disruptions attributable to those activities were neither substantial nor unreasonable.

For example, regarding parties, Gantz testified that he had purchased the property as a family vacation home, that he and his family live most of the year in Las Vegas, that their use of the property was "pretty infrequent,"[14] that they had never rented the property out as a short-term rental, and that no one stayed at the property when he and his family were not there.

Gantz further testified that, when he and his family *were* at the property, "[w]e never played loud music or had ragers."  Instead:  "It was

---

[14]    Although there is some ambiguity in Gantz's testimony regarding how many times per year, and which specific months of the year, he and his family used the property, Finley and Adams's repeated references to Gantz as an "absentee owner" tend to corroborate his testimony that use of the property was "pretty infrequent."

always families, kids, and adults. We'd have dinner, play some cornhole, and be in at a reasonable hour." "[M]ost nights we were out there," he testified, "we'd be in bed 8:00, 9:00." "To [say we were] having wild parties, it's just kind of crazy in my mind." Gantz further testified that he could not recall anybody having ever complained to him about loud parties. In keeping with this testimony, Cathleen Nielsen—a next door neighbor of Gantz who Finley and Adams called as a witness—testified: "[t]he noise didn't bother me too much."

As for drones, the trial court heard testimony that, after the deck had been completed, each of two vendors—first Gantz's contractor, and then one of the contractor's suppliers—flew a drone to gather photographs for marketing purposes. The court also heard testimony that Gantz had not authorized either of the two flights, and had not learned about them until after they occurred.

On the basis of this substantial evidence, we find no error in the trial court's determination that the "noise disruptions" presented did not constitute a nuisance.

As to the second type of disruption (i.e., visual disruption), the trial court received evidence, not only from the parties and some of their neighbors, but also from real estate appraisal experts Kevin Allin (for Finley and Adams) and Larry Heglar (for Gantz).

Insofar as views are concerned, these two experts agreed that—with or without the extended deck and gazebo on Gantz's property—the view from the Finley/ Adams property was limited. Allin testified that the view was "not . . . an expansive 180-degree view," but rather a 40-degree "view corridor" that "is really restricted on each side." Heglar testified: that the views from Finley and Adams's property were "marginal" to begin with; that

"the view directly to the west" was "the main view;" that it did not have any significant value; that the optimal view (toward the ocean, bay, and waterfront) was the one to the south, from the southwest-most corner of the Finley/Adams deck; that the view corridor corresponding to this view was about 20 degrees (rather than 40 degrees); and that the extent to which the extension of the deck and introduction of the gazebo on the Gantz property had impaired the view from the Finley/Adams property was 10 percent. Heglar further testified that photographs Allin had used to illustrate the views from the Finley/Adams property had been "zoomed in" and that this distorted the appearance of those views. Allin conceded the point and acknowledged that "the effect [of zooming in] would be to make the [Finley/Adams] view corridor appear larger" than it actually was.

With respect to privacy, the trial court heard testimony from Gantz to the effect that the extension of the deck and introduction of the gazebo on his property had had no effect on sight lines toward the Finley/Adams property.

> "The sight lines that I have into my neighbors' yards, . . . [including] the plaintiffs and the people down below, it is no different now than it was when I had my original deck. I could see everything then that I can see now. I'm not getting any additional vantage point or getting insight into anything that I didn't already have from the old deck that would be any loss of privacy. So it just blows my mind that these statements [about the extension of the deck and addition of the gazebo having impaired Finley and Adams's privacy] keep being made."

This testimony was corroborated by Heglar, who testified that views of the Finley/Adams property from the Gantz property were largely "obfuscated" by large eucalyptus trees and an approximately 7- or 8-foot-tall wall. "In looking from the back of the Gantz property into the plaintiffs' property," Heglar testified, "I cannot see much of the patio area at all."

26

Significantly, the evidence before the trial court with respect to views and privacy included not only that just described, but also observations the trial court itself made during its site visit to each property. (See *Vaughn, supra,* 2 Cal.App.3d at p. 678 [fact finder's view of premises qualifies as "independent and substantial evidence" and reviewing court is "required to presume . . . [it] supports the . . . judgment"]; *Anderson, supra,* 61 Cal.App.2d at p. 145 [fact finder's view of premises is sufficient to support a judgment].)

On the basis of the substantial evidence described above, we find no error in the determination, set forth in the trial court's statement of

decision,[15] that "the deck/gazebo do not constitute a substantial and unreasonable interference with [Finley and Adams's] use and enjoyment of

---

[15] Finley and Adams argue the trial court failed to adequately address issues that they raised in objections to a proposed statement of decision and, therefore, that the doctrine of implied findings is inapplicable to this appeal. We do not agree. It is well settled that:

> " '[T]he trial court is not required to respond point by point to the issues posed in a request for statement of decision. The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.' [Citations.] 'When this rule is applied, the term "ultimate fact" generally refers to a core fact, such as an essential element of a claim.' [Citation.] 'Ultimate facts are distinguished from evidentiary facts and from legal conclusions.' [Citation.] Thus, a court is not expected to make findings with regard to 'detailed evidentiary facts or to make minute findings as to individual items of evidence.' In addition, '[e]ven though a court fails to make a finding on a particular matter, if the judgment is otherwise supported, the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings.' "
> (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 983.)

Here, the statement of decision fairly disclosed the court's determination that, to whatever extent the deck or gazebo interfered with Finley and Adams's use and enjoyment of their property, that interference was "not . . . substantial and unreasonable"—as required to establish liability on a theory of nuisance. Further, as discussed above, the judgment is supported by substantial evidence in the record.

their property."[16]  (Cf. *Mendez, supra,* 3 Cal.App.5th at p. 263. [recognizing the "unavoidable clash of individual interests" in organized society, observing that "that each individual in a community must put up with a certain amount of annoyance, inconvenience and interference," and noting that "the law of torts does not attempt to impose liability or shift the loss in every case in which one person's conduct has some detrimental effect on another," italics omitted]; *Eisen, supra,* 36 Cal.App.5th at p. 635 ["a landowner has no right to an unobstructed view over adjoining property"].)[17]

---

[16]  Our analysis of Finley and Adams's nuisance claim dispenses, not only with that claim, but also with the breach of contract claim to the extent it is premised on the part of paragraph 3 of the original CC&Rs that proscribes any activity that "may be or may become an annoyance or nuisance to the neighborhood."  Zeroing in on the words "annoyance or" in the above-quoted phrase, Finley and Adams argued at trial that an annoyance is distinguishable from, and more easily established than, a nuisance.  According to counsel, an annoyance is anything that is "bothersome."  But, to interpret paragraph 3 in so expansive a manner would fly in the face of the "obvious truth that each individual in a community must put up with [*some*] amount of annoyance."  (*Mendez, supra,* 3 Cal.App.5th at p. 263.)  Hence we interpret the term "annoyance or nuisance" as synonymous with the term "nuisance."  (See Black's Law Dict. (12th ed. 2024) pp. 1280–1281[noting that, historically, "nuisance" was "also termed *annoyance*"].)

[17]  The parties have made arguments pertaining to damages and injunctive relief; however, our determination that Finley and Adams have not established liability renders it unnecessary for us to address those arguments.

### III.
### DISPOSITION

The judgment is affirmed. Gantz is entitled to costs on appeal.


KELETY, J.

WE CONCUR:


DATO, Acting P. J.


BUCHANAN, J.